STATE, Respondent, *v.* LAVELLE, Appellant.

(No. 6,844.)

(Submitted May 8, 1931. Decided May 13, 1931.)

[300 Pac. 293.]

*Mr. Rock D. Frederick,* for Appellant, submitted a brief and argued the cause orally.

*Mr. L. A. Foot,* Attorney General, and *Mr. T. H. Mac-Donald,* Assistant Attorney General, for the State, submitted a brief; *Mr. MacDonald* argued the cause orally.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

Michael David Lavelle has appealed from a judgment of conviction of murder in the first degree, on which he was sentenced to life imprisonment, and from an order denying him a new trial. The only question for determination is as to the sufficiency of the evidence to support the judgment.

In June, 1930, defendant and his wife were visiting in the home of one Alfred Peterson across the Stillwater River from Kalispell. In the early morning of June 13 there were present at the Peterson house Peterson, the defendant, known as Billy, his wife, Julia, and a neighbor by the name of Jed Smith. After some conversation, Smith started for home. Defendant went to the rear for wood and Peterson left by the front door, intending to go to Kalispell for groceries. He had reached his bicycle and placed his hand on the handlebars when last seen by defendant. However, Peterson had forgotten a bag in which to carry the groceries, and turned back to the kitchen for it. While in the kitchen, near a door leading into the bedroom which was open, according to his testimony, Peterson heard Julia, in the bedroom, cry, "Billy, Billy," and immediately heard two shots in quick succession. It took him but an instant to step to the door, when he saw defendant standing near the door with a rifle in his hands and Julia standing at the foot of the bed, about four feet distant. The witness knew that she had been shot, as she was sup-

porting herself by holding to the foot of the bed. Peterson took hold of the gun and told defendant to "let go," which he did, saying, "Julia shot," and told Peterson to go for the sheriff and a doctor. Without aiding the woman in any manner the two men went to the Smith home and returned with Mrs. Smith, after Peterson had phoned for a doctor and notified the sheriff. Mrs. Lavelle was found unconscious on the floor and Mrs. Smith commanded the two men to place her on the bed; she was bleeding from the nose and mouth and died within a few minutes. Beside the blood on the bedroom floor, three spots of blood were found on the kitchen floor; whether the wounded woman entered, or could have entered, the kitchen in the absence of the two men, does not appear. One witness gave it as his opinion that the blood spots on the kitchen floor might have been made while deceased was being carried out. An autopsy disclosed that the woman was shot in the left breast and abdomen, the bullets ranging downward at an angle of forty-five degrees; either would have proved fatal.

The state produced one witness who testified that about eighteen months prior to the killing, defendant had kicked his wife and threatened to kill her. A woman companion of deceased testified that on June 4 she was with Julia at the Peterson place when, on seeing defendant coming, Julia hurried her out of the back way; that Julia was scared of him and said that he would kill her; that they hid in a swamp for about two hours and then got a ride to Whitefish, where they stayed overnight. The next morning defendant arrived at Whitefish and the witness went back to Kalispell, where she was visited by defendant the following morning before she was up. On this visit, the witness stated, defendant attacked her with a knife and declared he was going to "get" Julia. This was but seven days before the killing.

The keeper of a lodging-house in Polson testified that shortly before June 13, defendant called at her place looking for his wife; he insisted that she was there and when convinced that she was not, said, "I will get her yet"; and later that he said he would "find her and get her."

On the day before the shooting, defendant and his wife went together to the office of an attorney in Kalispell and had a complaint for divorce, on the ground of cruelty, drawn for the woman. The attorney testified that they then seemed to be on good, and even affectionate, terms; they both cried in his office.

A former husband of Julia testified that, on two or three occasions since her marriage to defendant in July, 1928, he had furnished her with money and, a few days before the shooting, he had had her out in a car, but did not know whether or not the husband knew of it; however, the defendant had warned him to keep out of his affairs.

Just prior to the shooting, Julia stated that she was going to Kalispell, the defendant commanding her not to go; she insisted but was unable to find her shoes; they were later found in a "cubby-hole" leading from the bedroom to the cellar.

The theory of the defendant was that, believing that she had an incurable disease, the woman had killed herself. The defendant, his sister and two other witnesses testified to former attempts at, and threats of, suicide.

Defendant's testimony is that, as he neared the rear entrance of the house with an armful of wood he heard a shot, dropped the wood on the porch and rushed through the kitchen into the bedroom, where he saw his wife holding the rifle above her head with the muzzle pointing to her breast, her finger on the trigger; that she said, "I told you so, Billy"; that he took hold of the gun and she fought him and in the scuffle the gun was again discharged. Defendant further testified that he, Peterson and Julia sat up practically all of the night before, talking; that Julia then said that she was going to kill herself because she was going to die anyway, and that he asked Peterson if there were any shells for Peterson's rifle about the house, to which Peterson replied, "You need not worry about the shells. I have the shells hid." Defendant denied that he had ever abused his wife or made threats against her. He testified that they had had no quarrel or trouble and that the application for divorce was made because of her disease and the fact that

he had no money for treatment; they thought that after divorcing him she could get medical aid from the county, whereas she could not get it as a married woman.

The state's case, both by its testimony in chief and on rebuttal, casts serious discredit upon defendant's story. If Peterson's testimony in chief is to be believed, there was no appreciable lapse of time between the two shots, so that it would have been impossible for defendant to have dropped his wood and entered the house between them. This witness further testified that there was no sound or evidence of a struggle in the bedroom, and he entered almost at the instant the last shot was fired to find the two participants standing four feet apart, the defendant holding the gun, the wife supporting herself by the foot of the bed. On rebuttal the witness stated that the parties did not sit up the night before; on the contrary, that "Billy went to bed first, between 8 and 9, and Julia went to bed maybe an hour later"; that Julia never mentioned killing herself and that he had no conversation with defendant on the subject of, or as to hiding, the shells. This witness and two or three others testified that no wood was dropped on the porch or anywhere about the rear of the house.

Defendant's story on the stand differs materially from that told to the officers, separately, shortly after the killing.

As to the possibility of his story being true, it was shown that the woman was but five feet one inch tall, with a reach of but twenty-four inches, while the rifle was thirty-seven inches long; what the length of the barrel was is not shown, but it is clear that, in order to place her finger on the trigger and fire the rifle, she would have had to have the muzzle of the rifle against her body, if she could have reached the trigger at all.

The shells from which the bullets were fired were branded with an H and had been loaded with smokeless powder. Securing smokeless powder cartridges, also branded H, the sheriff and coroner experimented with the rifle, firing at stated distances into a piece of the woman's dress, placed over a rubber overshoe. The dress was not powder-burned at all, and was but slightly powder-marked around the upper bullet hole only.

The experiments made by the witnesses indicated to them that the bullet which entered the woman's breast was fired with the muzzle of the gun from fourteen to sixteen inches from her body, and the other "close to twenty inches from the body." Whether or not these experiments were accurate, it is clear that the shots were fired when the muzzle of the gun was some considerable distance from her body.

It is contended that the course of the bullets in the body corroborate defendant's testimony, for, while she was short, defendant was an inch or so shorter, and, had he shot at her direct, the course of the bullets would have been straight in, or upward. We cannot appreciate the force of this argument. Although the woman was described as "standing" at the foot of the bed just after the shots were fired, there is no testimony describing her position as erect, or otherwise, and nothing to indicate what was her position at the time the shots were fired. On the appearance of her husband with the leveled gun, she may have crouched down or shrunk back, or she may have leaned forward in an attempt to grasp its muzzle, under any of which circumstances she may have presented her body in such a position as to receive the wounds as inflicted.

On the other hand, even disregarding the fact that her dress was not powder-burned, it would seem that, had the woman shot herself, she would naturally have rested the butt of the rifle upon or against some piece of furniture for support, and, in that position of the rifle, the course of the bullets would have been more apt to have been upward than downward. If the woman inflicted what she intended to be a death wound upon herself, it would have been the one in the breast, naturally, and with such a wound it is inconceivable that she could have struggled with defendant for possession of the rifle immediately after receiving it.

While the evidence is circumstantial, it is substantial and supports the judgment; there are no physical facts rendering the testimony on behalf of the state improbable or unbelievable, nor is there any hypothesis, other than that of defendant's guilt, sufficiently reasonable to justify a reversal of the

judgment, based as it is on a verdict of a jury on conflicting evidence.

Judgment and order affirmed.

Mr. Chief Justice Callaway, Associate Justices Ford and Angstman and Honorable Henry G. Rodgers, District Judge (sitting in place of Mr. Justice Galen disqualified), concur.